UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| City of Millville, | : | Hon. Joseph H. Rodriguez |
| | : | |
| Plaintiff, | : | Civil Action No. 07-1073 |
| v. | : | |
| | : | |
| Rock, *et al.*, | : | |
| | : | Opinion |
| | : | |
| Defendants. | : | |

Presently before the Court is a Motion for Summary Judgment [24] filed by

Defendants, The Leonard K. Nave Irrevocable Family Gifting Trust, Kenneth C. Rock,

The Sue Rock Irrevocable Family Gifting GSTT Trust, and Leonard K. Nave.  The

Complaint in this matter seeks to hold both Kenneth Rock and Leonard Nave personally

liable for two promissory notes executed between the parties (Count I) and also claims

that Defendants fraudulently induced Plaintiff to rely on reports of Defendants' financial

condition with the intent to induce Plaintiff to loan Defendants money (Counts II and

III). Defendants argue that summary judgment is warranted because there are no

genuine issues of fact related to whether (1) Kenneth Rock or Leonard Nave personally

guaranteed the promissory notes at issue in this case or (2) whether Defendants' failure

to disclose a potential bankruptcy constitutes fraud.  In addition, Defendants argue that

the Complaint should be dismissed because Plaintiff cannot prove that it sustained any

loss as result of Defendants' actions, or lack thereof, because Plaintiff failed to timely

record the mortgage at issue.  Finally, Defendants argue that Plaintiff's expert's opinion

should be struck as an impermissible "net" opinion.

1

After considering the initial written submissions of the parties, oral argument on the merits of the summary judgment motion was held on May 25, 2009.  Soon thereafter, Defendants filed supplemental materials and briefs in further support of the motion.  In light of Plaintiff's objection to these supplemental materials, discovery was re-opened for a period of ninety (90) days and Plaintiff was granted an additional thirty (30) days to file its rebuttal papers.

The subsequent supplemental briefs raised additional issues, which were discussed during a telephone conference on November 19, 2009.  After considering the arguments made during the telephone conference, the Court permitted additional filings on these issues and the parties have each filed supplemental letter briefs.[1]  The merits of the motion have now been fully explored and briefed by the parties and the Court has reviewed all of the written submissions and oral arguments of counsel presented during the hearing on May 25, 2009 and during the telephone conference call on November 19, 2009.  For the reasons stated below, Defendants' Motion for Summary Judgment is granted in part and denied in part.

## I. Factual Background

The Court views the facts and all reasonable inferences drawn therefrom in the light most favorable to Plaintiff because Defendants move for summary judgment.  The facts are as follows.  In or around Fall of 2004, Leonard 'Buzz' K. Nave ("Nave"), Vice-

---

[1]        Generally, the issues raised during the November 19, 2009 telephone conference call focused on Defendants' request to re-depose Millville's expert based upon the expert's submission of a supplemental opinion report.  The parties also discussed whether their relationship with each other falls into the category of traditional lender/borrower.  These issues were more fully developed in the supplemental submissions received by the Court following the November 19, 2009 telephone conference call.

Chairman and General Counsel of The Glass Group, Inc., ("Glass Group" or "GGI"), approached Donald S. Ayers ("Ayers"), Millville's Economic Development Director, and indicated that GGI needed financial help from Millville.  (Def. Ex. 9, Nave Dep. 33:10-24).  Ayers sought to accommodate GGI, as the company employed many people in the city.  In fact, GGI employed "approximately 425 to 450 hourly employees," as well as "100 salaried personnel."[2]  (Def. Ex. 9, Nave Dep. 27:21-22.)

Around the "November, December time frame", Rock and Nave represented to Ayers that GGI's financial condition was improving.  (Def. Ex. 11, Ayers Dep. 33:7-23.) Nave specifically represented that a loan would permit GGI to survive.  (Id. at 34:7-11.) The basis, in part, for these representations was a report authored by the Carl Marks Group ("Report").  (Id. at 34:5-6.)  Entitled, "FY 2005 Base Cash Income Statement, FY 2005 Profit Improvement Programs Draft," the Report was issued on October 25, 2004 to appraise CIT of operations of GGI.[3]  (Def. Ex. 9, Nave Dep. 548-16.)  On or about November 1, 2004, Millville agreed to loan GGI $311,430.00.  (Def. Ex. 11, Ayers Dep. 12:9-19.)

According to Millville, on or about December 1, 2004, Rock and Nave personally guaranteed the repayment of that loan.  They cite the plain language of the Promissory Note to substantiate this contention.  Paragraph 6 of the Note states in its entirety–"The borrower shall *personally guarantee* the repayment of all funds borrowed."  (Def. Ex.

---

[2]     Indeed, the terms of the eventual loan agreements contained promises to make a "good faith effort" to retain 600 jobs in Millville.  (See Def. Ex. 11) ("The Borrower agrees to make a good faith effort to provide the following employment positions in connection with the approved investment . . . . JOBS TO BE RETAINED - TOTAL 600").

[3]     CIT was the primary lender to GGI, followed by Fifth Third and Map, respectively.  (Id. at 21:12-14.)

11, Ex. 2 Ayers Dep.) (emphasis added).

On or about December 5, 2004, Millville agreed to issue GGI a second loan in the amount $700,000.00.  (Def. Ex. 15.)  The Promissory Note for that loan was executed on or about December 29, 2004.  (Def. Ex. 11, Ex. 7 to Ayers Dep.) With respect to that Note, Rock and Nave insisted that the 'personally guarantee' language be excised from that document.  In its stead, language stating that the "Trusts guarantee" repayment was included.[4]  The new clause stated in its entirety–"The undersigned trusts hereby guarantee the repayment of this loan made to the aforesaid corporation."  Millville underscores that the personal guarantee language was not removed from the Promissory Note for the first loan of $311,430.00.  (Pl. Counter Statement of Material Facts ¶ 10.)

Both Promissory Notes were signed by Nave and Rock, with official titles ("Chairman & CEO", and "Vice-Chairman and General Counsel") immediately following their names.  Additionally, both loans were made pursuant to the City of Millville Economic Development Program, with funding provided by the Enterprise Zone Assistance Fund pursuant to the New Jersey Urban Enterprise Zone Authority.  See N.J. Stat. Ann. § 52:27H-61.

Less than two months after obtaining the $700,000.00 loan, GGI commenced bankruptcy by filing a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code.[5]  Plaintiff contends that Defendants began contemplating bankruptcy

---

[4]    Two trusts, which are named Defendants in this action, were equal shareholders of GGI. The Sue Rock Irrevocable Trust (named after Rock's now ex-wife) and the Leonard K. Nave Irrevocable Family Gifting Trust each held a twenty-six percent share  of GGI, for a combined fifty-two percent ownership stake.

[5]    Generally, Chapter 11 permits an organization to restructure its finances, in lieu of liquidating all of its assets, in an effort to preserve jobs and maintain operations.  See In re: SGL Carbon

4

as early as October of 2004. (Def. Ex. 9, Nave Dep. 93:-94.) It was at that point that

Nave first consulted with a bankruptcy attorney. (Id.) To buttress this contention,

Plaintiff notes the language included in Nave's Declaration in Support of First Day

Relief. (See Def. Ex. 25.) There, in support of the bankruptcy filing, Nave declared,

> Prior to the Petition Date, Glass Group, with the assistance of its management and professionals, explored a variety of strategic and financial alternatives, including the location of alternative forms of financing and the sale of Glass Group's business . . . and assets . . . both in and outside of Chapter 11.

(Id.) The attorney with whom Nave consulted in October of 2004 is the same attorney

who handled the bankruptcy in February of 2005. (Def. Ex. 9, Nave Dep. 93-95.)

Millville was not notified of Defendants' contemplation of bankruptcy or sale of GGI.

(Pl. Counter Statement of Material Facts ¶ 18.) In fact, the first notification received was

on the date of filing– February 28, 2005. (Id.)

On December 8, 2005, GGI commenced an adversary proceeding in Bankruptcy

Court against the City of Millville. (Id.) There, GGI sought to avoid the Mortgage, given

to Millville as security for the Notes, on the basis that the Mortgage was recorded within

ninety days of the bankruptcy Petition date, and also to compel turnover of $43,313.00

in payments made by GGI to Millville after Petition date. (Id.) For purposes of the

instant matter, the significant allegation of GGI was that Millville failed to timely record

the mortgage within ten days pursuant to 11 U.S.C. § 547. (Id.) As a result, that

mortgage arguably became a preference or unsecured loan upon GGI's commencement

---

Corp., 200 F.3d 154, 158 (3d Cir. 1999). "The fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources." NLRD v. Bildisco & Bildisco, 465 U.S. 513, 528, 104 S. Ct. 1188, 1197 (1984).

of bankruptcy.  The adversary proceeding was settled, and the Bankruptcy Court did not ultimately rule on the recordation issue.  (Def. Ex. 10, McCarthy Dep. 23-24.)  Under the terms of the settlement, Millville was given an allowed secured claim of $140,000.00, and an allowed general unsecured claim of $860,000.00.  (Def. Ex. 7.)  The $140,000.00 was paid within ten days, and the City of Millville kept all prior payments received.  (Id.)

The crux of Plaintiff's claim is that Millville purposely failed to disclose that it was contemplating bankruptcy and/or the sale of the business and through their own statements that the loan would permit GGI to survive and the Carl Marx Report fraudulently attempted to secure the loan.  In support, Plaintiff's experts, Terry Ann Marion, CPA and Kenneth W. Moore, CPA, Swartz & Company, LLC, issued reports to determine whether the information presented in the Carl Marks Report was fair and accurate.  (Pl. Counter Statement of Material Facts ¶ 21.)  They concluded that it was not.  (See Def. Ex. 6.)  Marion and Moore opined "that the $700,000.00 loaned to Glass Group was minuscule in relation to the company's operations and outstanding debt" and that the loan comprised 1% of the total debt and liabilities for 2004 and 0.85% of the same for 2005.  (Id.)  In short, they opined, the $700,000.00 loan "could not, in itself, revitalize Glass Group's finances."  (Pl. Counter Statement of Material Facts ¶ 23.)

Defendants argue that the bankruptcy was necessitated by a snowstorm and Capital Source's decision to withdraw conventional financing in favor of restructuring.  Defendants point out that a snowstorm hit Millville and Pennsylvania in January of 2005.  (Def. Ex. 9, Nave Dep. 98:2-3.) According to Nave, this snowstorm had a devastating impact on GGI's bottom line;

6

[I]n our operations, we use oxygen, as well as gas, for the furnaces.  And the oxygen is delivered from Pennsylvania by truck on a weekly basis.  The snowstorm shut down the roads, shut down the oxygen delivery, which shut down our furnaces.  And we were unable to get the furnaces back and running properly for probably at least 20 days, maybe as much as 30 days.  So it just obliterated our month of January.

(Id. at 98:6-15.)  This snowstorm had a "snowball effect" on GGI.  (Id. at 100:19.)

[I]t effected our operating statement for January, obviously, which then effected our lenders.  And it put them in a position to question whether or not we would survive it based on the fact that we had that significant loss.  Because we had shown profitability in the . . . last couple of months of '04.  And would have continued–I think, would have continued in January . . . but for that happening.

(Id. at 100:19-25, 101:1-3.)

In any event, the United States Bankruptcy Court in the District of Delaware entered an Order confirming an Amended Liquidated Plan proposed by GGI on June 21, 2006.  (Def. Ex. 7.)  This lawsuit followed.

## III. Procedural History

This case was removed from the Superior Court of New Jersey, Law Division, Cumberland County on March 7, 2007 pursuant to 28 U.S.C. § 1441 on the basis of diversity jurisdiction.  See 28 U.S.C. § 1332.  Because this Court sits on the basis of diversity jurisdiction, the laws of the state govern.  See Thabault v. Chait, 541 F.3d 512, 521 (3d Cir. 2008) (citing Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)).  Accordingly, the laws of the State of New Jersey govern the instant dispute.

## III. Legal Standard

Summary judgment shall be granted "if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law."  See Pearson v. Component Tech.

<u>Corp.</u>, 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)); <u>accord</u> Fed. R. Civ. P. 56(c).  This Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  <u>See</u> Fed. R. Civ. P. 56(c).

An issue is "genuine" if it is supported by such evidence that a reasonable jury could return a verdict in the nonmoving party's favor.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  <u>Id.</u>  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party.  <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  <u>Id.</u>; <u>see</u> <u>also</u> <u>Maidenbaum v. Bally's Park Place, Inc.</u>, 870 F. Supp. 1254, 1258 (D.N.J. 1994).  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  <u>Andersen</u>, 477 U.S. at 256-57.  "A nonmoving party may not 'rest upon mere allegations, general denials or ... vague statements ... ' "  <u>See</u> <u>Trap Rock Indus., Inc.</u>

8

v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991))

In deciding the merits of a party's motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  Credibility determinations are the province of the finder of fact.  See Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).  If there is no genuine issue of material fact upon review of cross-motions for summary judgment, then judgment may be entered in favor of the deserving party in light of the law and undisputed facts.  See Iberia Foods Corp. v. Romeo Jr., 150 F.3d 298, 302 (3d Cir. 1998)(citing Ciarlante v. Brown & Williamson Tobacco Corp., 143 F.3d 139, 145-46 (3d Cir. 1998)).

## IV. Discussion

Defendants move for summary judgment against the personal guaranty claim.  In addition, Defendants seek to have Plaintiff's expert's opinion stuck as an impermissible 'net' opinion.  Finally, Defendants move for summary judgment as to the fraud claim on two grounds: (1) that they did not have a duty to disclose a bankruptcy or sale that they were not contemplating and/or (2) that because Millville failed to timely record the mortgage, Defendants are not the proximate cause of the loss.

### A.    Guaranty Claim

When interpreting contracts of guaranty, the rules governing the construction of contracts apply.  Garfield Trust Co. v. Teichmann, 95 A.2d 18, 22 (N.J. Super. Ct. App. Div 1953). Here, the issue is whether Rock and/or Nave exposed themselves to personal

liability when they signed the promissory notes.  In addition to applying contract

principles, this consideration is further guided by agency principles.  7 W. Fletcher,

*Cyclopedia Corporations* § 3005 at 121. In New Jersey, determinations of liability on a

guaranty is governed, in part, by N.J. Stat. Ann. § 12A:3-401(a), which states:

> A person is not liable under an instrument unless the person signed the
> instrument or the person is represented by an agent or representative who
> signed the instrument and the signature is binding on the represented person
> under 12A:3-402.

See also, N.J. Stat. Ann. § 12A:3-402.

Although the parties have not identified any New Jersey Supreme Court

precedent directly on point, there are several cases from the New Jersey Appellate

Division that provide the relevant considerations to determine the scope of Rock's

and/or Nave's liability as to the Notes.  Facially, the language contained within the

contract is strictly construed against the entity that insists on the disputed language.

Nat'l Westminster Bank N.J. v. Lomker, 649 A.2d 1328, 1332 (N.J. Super. Ct. App. Div.

1994)(citations omitted).  The first promissory note, for the amount of $311,430.00,

contains a clause stating that "[t]he borrower shall personally guarantee the repayment

of all funds borrowed."  Promissory Note, Ex. 2.  The first note was signed on behalf of

Glass Group by Kenneth Rock, the Chairman and CEO, and Leonard Nave, the Vice-

Chairman and General Counsel.  The second note for $700,000.00 contains a clause

that states" "[t]he undersigned hereby personally guarantee the repayment of this loan

made to the aforesaid corporation."  Id.  But the word the word "personally" is crossed

out, with the word "trusts" penned in its place.  The City of Millville Loan Agreement

defines "The Glass Group Inc." as the "Borrower".  See Ex. 26.  Construing this language

10

strictly against Plaintiff, the borrower is "The Glass Group, Inc.", not Rock and/or Nave. See Nat'l Westminster Bank N.J., 649 A.2d at 1332. Thus Plaintiff's claim that borrower is Rock and or Nave is dependant upon a flawed reading on the Notes and therefore unpersuasive.

In addition, a second consideration adopted by the New Jersey Appellate Division counsels against a finding of personal liability because of the manner in which both notes were signed. In an unpublished opinion in Home Buyers Warranty v. Roblyn Dev. Corp., 2006 WL 2190742 (N.J. App. Div. 2006), the Appellate Division ruled that personal liability did not attach to a builder who signed a contract without indicating his professional capacity because the builder only signed the contract once. In so ruling the Court applied the rule set forth in Salzman Sign Co. v. Beck, 176 N.E.2d 74, 76 (N.Y. 1961), a decision rendered by the New York State Appellate Division.[6] Under the

---

[6]     Other jurisdictions aside from New Jersey have adopted the New York Salzman rule regarding the validity of personal guaranties of corporate promises. See Tr. of Minn. Ceramic Tile and Allied Traders Ret. Fund v. His & Her Ceramic Tile, No. 01-978, 2002 WL 507018 *2 (D. Minn. April 1, 2002) (noting that it was not clear that the officer wanted to assume the principal's liability even though the agreement stated that it was binding "personally and individually" on the officers of the corporation); Bankers Motor Leasing, Inc. v. Horn, 521 P.2d 1292, 1292 (Colo. App. 1974) (finding that the absence of a separate signature line is not conclusive, but rather evidence to be weighed against findings of made as to the intent and understanding of the parties); McCarthy v. Azure, 22 F. 3d 351, 356 (1st Cir. 1994) (finding that an agent who signed a purchase agreement as the chairman, and not in his personal capacity, is not a party to the agreement); Curtis G. Testerman Co. V. Buck, 667 A.2d 649, 653 (Md. 1995) (noting that an agent whose signature is captioned by the title "President" is not bound by the arbitration clause of the agreement); Livonia Bldg. Materials Co. v. Harrison Constr. Co., 742 N.W.2d 140, 145-46 (Mich. Ct. App. 2007) (finding that company president's signature on a document entitled "new customer credit form and individual guarantee" was corporate signature, not a personal guaranty, because the president only signed once in his official capacity); Wired Music, Inc. of the Greater Midwest v. Great River Steamboat Co., 554 S.W.2d 466, 470 (Mo. Ct. App. 1977) (stating that "[t]hree decisions of the New York courts support our conclusion that an agent of a disclosed principal may not be personally bound under a guaranty clause between the principal and another party, unless there is evidence of a clear and explicit intent to do so."); Diversified Realty, Inc. v. McElroy, 703 P.2d 323, 325 (Wash. Ct. App. 1985) (stating that "[i]f personal liability is intended the 'nearly universal practice' is to have the officer sign twice, once in his corporate capacity and once as an individual. 3A W. Fletcher, *Private Corporation* §

Salzman rule, explicit evidence of a corporate officer's intent to expose himself to personal liability must be demonstrated by requiring the officer to sign any contract twice; once in his official capacity and once in his personal capacity.  Salzman, 176 N.E.2d at 76.  Applying this rule, the court in Home Buyers held that, despite his failure to indicate his official capacity on the contract, because the builder only signed the contract once, he was signing on behalf of the company.  Home Buyers, 206 WL 2190742 at *4; see also  Am. Furniture Mfg., Inc. v. Value Furniture & Mattress Warehouse, No. 2995-06, 2009 WL 88922 *2 (N.J. Super. Ct. App. Div. Nov. 18, 2008)(where the court found a corporate officer was not personally liable despite language in the guaranty that "[t]he undersigned is an authorized agent of the applicant . . . and personally guarantees this account" because, inter alia, it only had one signature line).  Id.

Here, on both notes, Rock and Nave signed as representatives of their company and their respective trusts.  Both notes are signed by Rock and Nave in their professional capacities on behalf of The Glass Group.  On the $311,430.00 note, there is only one signature line binding The Glass Group.  The $700,000.00 note has two signature lines, for additional security.  In addition to signing on behalf of The Glass Group, the $700,000 note also contained an additional guaranty made by the Rock Irrevocable Family Gifting GSTT Trust and the Nave Irrevocable Family Gifting Trust.  Thus, Rock and Nave each signed the $700,000 note twice, once on behalf of The Glass Group and once as the trustee of their respective trust funds. Notably absent from both the

---

1119 at 170 (1975)).

$311,430.00 and the $700,000.00 notes is a signature line indicating individual liability. See, e.g., Home Buyers, 2006 WL 2190742; see also Salzman 176 N.E.2d at 76. Thus, an intention to assume individual liability cannot be gleaned from the four corners of the notes.

New Jersey also requires that the court search beyond the four corners of the document when determining whether there is explicit evidence that a personal guaranty was intended by the parties.  See Mount Holly State Bank v. Mount Holly Wash. Hotel, Inc., 532 A.2d 1125, 1128-29 (N.J. Super. Ct. App. Div. 1987) ("The terms of the guaranty must be read in the light of commercial reality-in accord with the reasonable expectations of persons in the business community involved in transactions of this type."). There is no genuine issue of fact related to whether Rock and/or Nave intended to personally guarantee the notes. Mount Holly State Bank, 532 A.2d at 1128-29. Rock testified in deposition that he did not intend to be personally liable.  Rock Dep. at 22; 19-23. Plaintiff has offered no evidence in the form of deposition testimony or affidavits that challenge this statement. To the contrary, Richard McCarthy, who actually drafted the notes for the City of Millville, acknowledged during deposition that Rock and Nave did not want to issue personal guarantees on the $700,000.00 note.

> Q. And about when was that executive session, before or after the transaction?
> A. That was before the transaction actually because they didn't want to personally guarantee the transaction and they wanted to pledge family trust or something as additional security or protection over the and above the real estate.

McCarthy Dep., Ex. 10, p. 30.

Viewing the transaction in its entirety and reading the "terms of the guaranty . . . in the light of commercial reality-in accord with the reasonable expectations of persons

in the business community" the Court finds that the promissory notes and the circumstances surrounding them do not demonstrate that Rock and/or Nave intended to be personally responsible for guarantying either promissory note. Mount Holly State Bank, 532 A.2d at 1128-29. As a result, summary judgment is granted as to Count I because Rock and Nave did not personally guarantee either of the two promissory notes.

### B.   Expert Report of Swartz & Company

Defendants next claim that Plaintiff's expert's opinion should be struck because it is a net opinion. A net opinion is not a specific factor under Daubert, nor can it be found as a specific rule in the Federal Rules of Evidence. See Holman Enter. v. Fidelity & Guar. Ins. Co., 563 F. Supp. 2d 467, 472 n.12 (D.N.J. 2008). Essentially, it's a long-standing rule that dictates exclusion of expert testimony that contains "bare conclusions, unsupported by factual evidence." Id. (citing Buckelew v. Grossbard, 435 A.2d 1150, 1156 (N.J. 1981)).

Defendants contend that the expert report of Swartz & Co. is premised on unreliable methodology. But Defendants' contentions overlook the reliance on The Glass Groups' tax returns for the years 2004 and 2005. Likewise, with respect to the impact that the loan would have on the company, Swartz and Company's opinion that the loan was too insignificant to stave off bankruptcy appears to have been formulated using acceptable accounting principles compiled pursuant to the Going Concern Checklist. Of course, Defendants are free to attempt to undermine the foundation of the expert's opinion during cross examination.

But, while Swartz and Company may be able to opine on the impact of the loans on The Glass Group's survival and the likelihood that Nave and/or Rock actually

14

believed in the accuracy of the report, the ultimate conclusion that the Marks' Report was prepared for the purpose of fraudulently inducing the City of Millville to extend the loan runs afoul of the Federal Rules of Evidence.  Federal Rule of Evidence 704(a), provides that "otherwise admissible" opinion testimony "is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."  Expert opinions have been struck when they impermissibly conclude that a legal standard has been satisfied. See, e.g., Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 218-19 (3d Cir. 2006) (while expert testimony regarding securities industry practices permitted as probative, but not determinative, of scienter, expert testimony regarding defendant's satisfaction of legal duties struck); see also, Burkhardt v. Washington Metro. Area Transit Auth., 112 F.3d 1207, 1212-13 (D.C. Cir. 1997)(expert permitted to attest to facts that if found would support satisfaction of a legal standard, but expert cannot opine that the standard has been met).

The report here goes beyond expressing an opinion probative of  Defendants' mental state or belief because it impermissibly concludes that the legal standard for fraud has been met.  Therefore, that portion of the opinion concluding that the report was prepared for the purpose of fraudulently inducing Millville to loan the money is struck.  As to the remainder of the opinion, Defendants' motion to strike is denied. Likewise, Defendants' request to re-depose Plaintiff's expert is denied.

### C.    *Fraud Claims*

Finally, Defendants claim that they did not owe a duty to disclose to Plaintiff and that they are not the proximate cause of Plaintiff's loss warranting summary judgment on the fraud claim. Plaintiff claims that Defendants committed fraud to further their

chances of securing financing.  Under New Jersey law, there are five elements of a common law fraud claim: (1.) A material misrepresentation of a presently existing or past fact; (2.) Knowledge or belief by the Defendant of its falsity; (3.) An intention that the other person rely on it; (4.) Reasonable reliance thereon by the other person; and (5.) Resulting damages. See Gennari v. Weichert Co. Realtors, 691 A.2d 350, 367 (N.J. 1997)(citing Jewish Ctr. of Sussex County v. Whale, 432 A.2d 521, 527 (N.J. 1981)).

### 1. Material Misrepresentation: Duty to Disclose

Plaintiff contends that the material misrepresentation here is one of omission; Defendants failed to disclose the fact that GGI was contemplating bankruptcy and/or the sale of the company.  "Silence in the face of a duty to disclose may constitute fraudulent concealment."  United Jersey Bank v. Kensey, 704 A.2d 38, 44 (N.J. Super. Ct. App. Div. 1997)(citations omitted); see also Berman v. Gurwicz, 458 A.2d 1311, 1314 (N.J. Super. Ct. Ch. Div. 1981).  Whether a duty exists is a question of law for the Court. Id.  "The question is one of fairness and policy that 'involves identifying, weighing, and balancing several factors--the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution.'" Kensey, 704 A.2d at 43-44 (quoting Hopkins v. Fox & Lazo Realtors, 625 A.2d 1110, 1116 (1993)).

It is well settled that "[a] party has no duty to disclose information to another party in a business transaction unless [1] a fiduciary relationship exists between them, [2] unless the transaction itself is fiduciary in nature, or [3] unless one party 'expressly reposes a trust and confidence in the other.'" N.J. Econ. Dev. Auth. v. Pavonia Rest., Inc., 725 A.2d 1133, 1139 (N.J. Super. Ct. App. Div. 1998)(quoting Berman, supra, 458

16

A.2d at 1313); see also Lightening Lube Inc. v. Witco Corp., 4 F.3d 1153, 1185 (3d Cir.

1993).  The Court must determine whether the present situation falls into one of these

three categories giving rise to a duty to disclose.

First, the business transaction here does not give rise to a fiduciary relationship.

Traditionally, a fiduciary relationship does not exist in creditor-debtor relationships

because their interests are adversarial in nature. Globe Motor Car Co. v. First Fidelity

Bank, 641 A.2d 1136, 1139 (N.J. Super. Ct. Law Div. 1993).  Both the New Jersey Courts

and the Court of Appeals for the Third Circuit adhere to the "general presumption that

the relationship between lenders and borrowers is conducted at arms-length, and the

parties are each acting in their own interest."  Kensey, 704 A.2d at 45 (quoting Temp-

Way Corp. v. Cont'l Bank, 139 B.R. 299, 318 (E.D.Pa. 1992); see also Paradise Hotel

Corp. v. Bank of Nova Scotia, 842 F.2d 47, 53 (3d Cir. 1988)(It "would be anomalous to

require a lender to act as a fiduciary for interests on the opposite side of the negotiating

table.")(quoting Weinberger v. Kendrick, 698 F.2d 61, 79 (2d Cir. 1982)).  Although

Plaintiff is a municipality and not a traditional lending institution, it was acting as a

lender in this transaction.  Therefore, no fiduciary relationship existed between the

parties.

Second, for the same reasons that the parties do not enjoy a fiduciary

relationship, the transaction is not intrinsically fiduciary.  Cases involving intrinsically

fiduciary transactions

> include[] those instances where there is no existing fiduciary relation
> between the parties, and no special confidence reposed is expressed by
> their words or implied from their acts, but the very contract or other
> transaction itself, in its essential nature, is intrinsically fiduciary, and
> necessarily calls for perfect good faith and full disclosure, without regard

to any particular intention of the parties. The contract of insurance is a familiar example. [§ 902 at 552-554]

Berman, 458 A.2d at 1313-14(citing Pomeroy, Equity Jurisprudence, (5 ed. 1941), § 901a).[7]

Here, the City of Millville Loan Agreement executed by the parties has a listed purpose that Plaintiff claims sets it apart from an ordinary loan rendering it intrinsically fiduciary.  The paragraph at issue states:

> 8) The Borrower agrees to make a good faith effort to provide the following employment positions in connection with the approved investment.

> <u>JOBS TO BE RETAINED- TOTAL</u>
> 600

(Loan Agreement, dated December 5, 2004, Ex. 26.)  In addition, because the loan was made pursuant to Economic Development Programs and funded by the Enterprise Zone Assistance Fund pursuant to the New Jersey Urban Enterprise Zone Authority, N.J. Stat. Ann. § 52:27H-61, Plaintiff claim baldly states the transaction is intrinsically fiduciary.  Plaintiff, however, fails to cite any persuasive authority for this contention.

In its supplemental brief Plaintiff cites to <u>Kensey</u> and concludes that a duty to disclose exists "given the nature of the transaction[.]" Pl.Supp. Br at 9.  <u>Kensey</u> involved a real estate transaction between a bank and a mortgagor where the bank failed to disclose that the appraisals of the subject properties were worth less than the selling price and mortgage.  704 A.2d 38.  The New Jersey Appellate Division held that the

---

[7]Although a Chancery Division opinion, <u>Berman</u> remains good law and its reliance on Pomeroy is well placed.  <u>See, e.g.</u>, <u>Cox v. RKA Corp.</u>, 753 A.2d 1112 (N.J. 2000)(relying on Pomeroy).

nature of the transaction was not intrinsically fiduciary.  Id. at 44-45.  Kensey, therefore, does not support Plaintiff's contention that this transaction is intrinsically fiduciary.

Here, even though the stated purpose for the loan is admirable, it is not intrinsically fiduciary.  Defendants, at all times, are acting in their own best interest to save the company.  The purpose, or goal, of the loan does not alter the fact that this is a lender-borrower situation.  Thus, much like the transaction between the bank and the mortgagors in Kensey, there is no basis to find that the transaction is intrinsically fiduciary. 704 A.2d at 45 ("Succinctly stated, this case involves neither a fiduciary relationship nor a transaction that is 'intrinsically fiduciary.'")

Third, Plaintiff's claim that the relationship between the parties qualifies as one that "expressly reposes a trust and confidence in the other" finds no support in the case law nor in the Restatement (Second) of Torts § 551(2)(e) (1977 & Supp. 1997), which explains and defines such relationships.  This class of cases

> embraces those instances in which there is no existing special fiduciary relation between the parties, and the transaction is not in its essential nature fiduciary, but it appears that either one or each of the parties, in entering into the contract or other transaction, expressly reposes a trust and confidence in the other; or else from the circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence in the particular case is necessarily implied. The nature of the transaction is not the test in this class. Each case must depend on its own circumstances. The trust and confidence, and the consequent duty to disclose, may expressly appear by the very language of the parties, or they may be necessarily implied from their acts and other circumstances. [Footnote omitted]

Berman, 458 A.2d at 1313-14(citing Pomeroy, Equity Jurisprudence, (5 ed. 1941), § 901a).

New Jersey adopted The Restatement in recognition of a growing trend to find a

duty to disclose in circumstances where a special relationship or trust exists between the parties. Strawn v. Canuso, 657 A.2d 420, 431 ( N.J.1995) *superceded on other grounds by N.J.Stat.Ann. § 46:3C-1 to -12*. The Restatement requires a party to disclose "facts basic to the transaction if he knows that the other is about to enter into it under a mistake . . . and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts." The Restatement (Second) of Torts § 551(2)(e) (1977 & Supp. 1997). The Court in Kensey specifically recognized "Comment 1" to subsection §551, which attempts to further define the class of relationships to which this duty would apply. "The comment observes that the situation envisioned is one in which the advantage taken of the plaintiff's ignorance is 'so shocking to the ethical sense of the community, and is so extreme and unfair, as to amount to a form of swindling....'" Kensey, 704 A.2d at 45(quoting Restatement § 551, Cmt. 1).

Plaintiff contends that it is acting as a gatekeeper to taxpayers funds provided by the Enterprise Zone Assistance Fund. And Defendants' own expert recognized that the formal relationship between the parties was relaxed:

> I should note that if this loan was made by a bank or lending institution, historical operations, debt structure, and ratios would have been prime consideration and information regarding these matters would have been required as a condition of any loan. The obvious purpose of this loan was to preserve jobs and business in Millville, not to make return on investment as would be prime consideration of a commercial lender. Millville never intended to rely on these factors and never requested any information regarding them.

Report of Fiorella, Ex. 7, pp. 10-11. In addition, Defendants did not have to go through a rigorous vetting process often associated with traditional lending practices, as

acknowledged by its own expert.

Plaintiff also relies on the New Jersey Appellate Division's decision in Judge v. Blackfin Yacht Corp., 815 A.2d 537 (N.J. App. Div. 2003) in support of its claim.  In Judge, plaintiff was the prospective purchaser of a special order motor boat and sued the retailer and the manufacturer alleging, *inter alia*, that the retailer had a duty to disclose that the manufacturer was in bankruptcy.  Id.  Plaintiff did not become aware of the manufacturer's bankruptcy until after he had made a non-refundable down payment on the specially ordered boat. Id. at 539.  After a meeting with the manufacturer's owner and being assured that the bankruptcy was a defensive measure that would not impair the ability to produce the boat, plaintiff agreed to continue with his purchase. Id.  The boat was produced but with a few cosmetic flaws and a list. Id.

Following a jury trial that concluded with a damages award to plaintiff, the New Jersey Appellate Division considered the jury's determination on the consumer fraud claim, which were predicated upon a finding of two acts of omission.  Id. at 541. The court ruled that the retailer did not have a duty to disclose the manufacturer's bankruptcy before the contract to purchase was signed because there was no foreseeable risk that the manufacturer would be unable to produce the boat. Id. at 542.  But Judge does not support Plaintiff's claim because it is a consumer fraud case.  Moreover, the court in Judge did not find a duty. Id.

Here, Plaintiff  relied on the Carl Marx report, which was prepared for CIT, a different lender to GGI. Nave Dep., Ex. 9, p. 55:6-15, 54:8-16.  But during oral argument, the parties agreed that reliance alone on the Carl Marks Report cannot serve as the basis for an action sound in fraud. "In order to be the basis for an action for fraud . . . the

alleged misrepresentation cannot be predicated simply upon a promise to perform that subsequently is unfulfilled." Lightening Lube, Inc., 4 F.3d at 1186; see also, Middlesex County Sewerage Auth. v. Borough of Middlesex, 181 A.2d 818, 825 (N.J. Super. Ct. Law Div. 1962)("An estimate is a mere approximation."). And Plaintiff was free to ask for additional information regarding the financial picture of Defendants; it simply did not do so.

Furthermore, Plaintiff cannot claim that it was completely unaware of the bleak financial picture at GGI because its Economic Director attended several meetings with Defendants and was aware that the GGI had immediate liquidity problems, was facing financial challenges, and that GGI was struggling to pay its utilities. (Ayers Dep. at p. 45;2-12; 35: 3-23.) In addition, despite Nave's alleged assurance that the loan would permit GGI to survive, Plaintiff's Economic Director testified in deposition that he was aware that there were limits to profitability and that GGI was actively seeking other sources of financing. (Id. at 9; 14-20.)

Based on all of the above facts, the circumstances of this case do not demonstrate conduct "so shocking . . . as to amount to a form of swindling.'" Kensey, 704 A.2d at 45(quoting Restatement § 551, Cmt. 1); Compare Lithuanian Commerce Corp., Ltd. v. Sara Lee Hosiery, 179 F.R.D. 450, 478 (D.N.J. 1998)(failure to disclose report to LLC in the context of the transaction did not amount "to a form of swindling."). As a result, a duty to disclose does not arise under these circumstances.

## 2. Alternative Finding of a Duty

Notwithstanding the finding that a duty to disclose does not arise under these circumstances, summary judgment is denied because there is a genuine issue of fact

related to whether Defendants' disclosures were entirely truthful.  "[W]hen a party makes a disclosure upon the subject during negotiation . . . it has the duty to clarify the matter and ensure it is truthful."  Maertin v. Armstrong World Indust., Inc., 241 F.Supp.2d 434, 462 (D.N.J. 2002).  Indeed, a "partial disclosure" may amount to fraud. Berman, 189 N.J. Super. 93.

Here, Mr. Ayers claims that Nave assured him that the loan would keep GGI operating.  (Ayers Dep., Def. Ex. 11, pp. 32:13-34:11;  Ayers Cert., ¶7.)  Mr. Nave in deposition, agreed that he represented that the loan was needed assistance, but not that the loan would save the company.

> I wouldn't say it that way.  I am certain that I said to him that it would aid and assist us in being able to keep the Glass plant in Millville.  That we definitely needed financial help in order to keep the plant going.  And – but whether that would absolutely do it, I don't think I ever said that.
>
> *          *          *
>
> Well as I recall, we had some pressing utility bills, and that this would allow us to – without the utilities, we couldn't keep operating.  But that this would allow us to catch up on utility bills, and it would let us keep operating.

(Nave Dep., Def. Ex. 9, pp. 51-52.)

In addition, Nave certified In Support of First Day Relief that GGI was exploring sales "both in and outside of chapter 11" before the filing date.  (Nave Decl., Def. Ex. 25, pg. 13.)  Michael Goodman of SSG testified during deposition that everyone was aware that GGI's inability to obtain financing would lead to a bankruptcy filing.  (Goodman Dep., Ex. E. to Fischer Cert., p. 38;6-22.)

But Defendants' attorney certified that GGI was not contemplating or pursuing bankruptcy during the loan negotiating period.  See Decl. of Derek Abbott, Esq., Ex. D.

to Defs. 12/10/09 Ltr. Br. at ¶2 (certifying that during the period at issue, GGI was

working to secure financing so as to avoid bankruptcy).  Ayers admitted in deposition

that he did not have any personal knowledge that GGI was considering bankruptcy.

(Ayers Dep., Ex. A to Defs. 12/10/09 Ltr. Br., pp. 20;1-6, 16;1-12.)   In fact, Ayers knew

that GGI was having trouble paying its utility bills and he was aware that the GGI was

looking for other lenders. ( Id. at p. 45;2-12; 35: 3-23.)  And there are ample factual

disputes related to the financial condition[8] of The Glass Group and the effect of the snow

storm on the operations and bottom line of The Glass Group.

For all of these reasons, viewing the facts in a light most favorable to Plaintiff,
there are numerous factual disputes and credibility determinations related to whether
Defendants' voluntary disclosures were entirely truthful preventing summary judgment.

### 3. Proximate Cause and Damages: Failure to Timely Record the Mortgage

There are genuine issues of fact related to whether the Defendants are the

proximate cause of Millville's alleged loss. Both parties agree that the 'substantial

contributing factor' test is applicable in the instant case to determine whether proximate

cause is satisfied. See McCabe v. Ernst & Young, LLP, 494 F.3d 418, 438 (3d Cir.

2007)(In the context of common law fraud, "the test of proximate cause is satisfied

where . . . conduct is a substantial contributing fact in causing [a] loss." )(citing 2175

Lemoine Ave. Corp. v. Finco, Inc., 640 A.2d 346, 351-52 (N.J. Super. Ct. App. Div.

---

[8] Although Defendants were not themselves the author of the Carl Marx Report, there is a
genuine issue of fact related to whether or not they believed the information contained therein was
accurate and whether they believed that the loan would permit The Glass Group to survive.  See Nave
Dep., Ex. 9, p. 27:21-22.  All of these considerations properly rest with the trier of fact.

1994)).

Defendants contend that Millville did not sustain any loss as a result of the projections contained in the Carl Marks Report.  (Def. Br. 31.)  Rather, the loss, Defendants contend, should be attributed to the failure to properly and timely record the mortgage.  (Id.)  Because the City's attorney failed to file the mortgage within the ten day grace period under § 547 of the Bankruptcy code[9], the mortgage became an unsecured preference when the Glass Group filed for bankruptcy within the ninety (90) days of the recording.  If the City's attorney filed the mortgage upon receipt, Millville would have been paid in full from the sale of the mortgaged property.  For this reason, Defendants conclude that "under no circumstances can defendants have been the proximate cause of the losses since the Mortgage which was provided to the plaintiff was not filed by Millville's attorney."  (Id. at 32.)  Defendants cite no law in their brief to support this position.

Plaintiff alleges Defendants' failure to disclose the contemplation of bankruptcy and sale of business as the substantial contributing factor to its loss.  (Pl. Opp'n Br. 17.) If Plaintiff knew about the possibility of a bankruptcy and/or sale, it would not have

---

[9] 11 U.S.C.A. § 547 provides, in relevant part:
Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property--
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made--
(A) on or within 90 days before the date of the filing of the petition; or
(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider.

been subject to the strictures of the bankruptcy code with respect to the recordation of the mortgage.  The same factual disputes related to whether Defendants failed to fully disclose its financial status to Plaintiff prevent summary judgment on this issue as well. For example, Rock testified in deposition that the decision to pursue Chapter 11 may have been made as early as January 31, 2005, rather than late February. Rock Dep. 66:1-23.  Thus, whether the snow storm or Capital Source's decision to withdraw conventional financing prompted the bankruptcy or whether the decision to file bankruptcy was present all along remains a factual dispute and clouds any foreseeability determination.  In New Jersey, "questions of whether an intervening act severs the chain of causation depend on the foreseeability of the intervening act and should be determined by the finder of fact." Port Auth. of N.Y. and N.J. v. Arcadian Corp., 189 F.3d 305, 318 (3d Cir. 1999)(quoting McCarthy v. Sturm, Ruger and Co., Inc., 916 F.Supp. 366, 372 (S.D.N.Y. 1996)(citation omitted)).

Since the timing of the filing of the mortgage is linked to the decision to file bankruptcy, the issue of proximate cause is best left to the trier of fact.  As a result, summary judgment is denied.

### V. Conclusion

For the reasons stated herein, summary judgment is granted as to the personal guaranty claim in Count I.  As to the remaining claims for fraud, summary judgment is denied consistent with this Opinion.  An appropriate order shall issue.

Dated: January 12, 2010

/s/ Joseph H. Rodriguez
HON. JOSEPH H. RODRIGUEZ
United States District Judge

26